IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SORENA LINTON, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 1:14-cv-1520 |
| ) | |
| ASHTON CARTER, ) | |
| Secretary of Defense ) | |
| ) | |
| *Defendant*. ) | |

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Ashton Carter's Renewed Motion for Summary Judgment. Dkt. No. 30. The matter has been fully briefed by the parties and the Court heard oral argument on July 31, 2015. For the reasons set forth below, the motion will be denied.

I.   **Background**[1]

This case arises out of an employment relationship between Plaintiff Sorena Linton and Defendant Ashton Carter, in his official capacity as United States Secretary of Defense on behalf of the U.S. Department of Defense Education Activity ("DoDEA").[2] In June 2008, Linton applied for a teaching position at one of Defendant's schools. Based on her "dream" record and multiple teaching certifications, she was hired to work as a teacher at Defendant's school on a military base in Incirlik, Turkey. Eddings Dep. 32:6–33:21. When Linton was hired, her race

---

[1] Because this matter is before the Court on Defendant's Motion for Summary Judgment, the facts are presented in the light most favorable to the plaintiff.
[2] Another entity frequently referred to by the parties, the Department of Defense Dependents Schools ("DoDDS"), appears to be under the umbrella of the DoDEA and represents its overseas component. *DoDDS*, U.S. DEPARTMENT OF DEFENSE EDUCATION ACTIVITY, http://www.dodea.edu/aboutDoDEA/DoDDS.cfm (last visited August 6, 2015).

and the national origin of her husband and son were unknown to Raynard Eddings, the school's principal. At some point after she was hired, Eddings learned that Linton was a white female, and that her husband was black and from Ethiopia.

On July 3, 2008, Eddings requested that Linton report to the school by August 19, 2008 to enable her to prepare her classroom. However, because her initial travel orders that allowed her access to the military base in Turkey were incorrect—namely, her point of origin and her child's name—she could not travel on them. In late September, she eventually arrived in Turkey with her husband and her son, and began working at the Incirlik school in early October 2008. Upon her arrival, she tried to add her husband to her orders so that he could access the base, but was unsuccessful.

On November 25, 2008, Linton complained to DoDEA officials at its headquarters in Belgium related to the continued problems she and her husband were facing as a result of his omission from her travel orders. By this time, Eddings was aware of the race and ethnicity of both Linton and her husband. Despite having no authority or control over her travel orders, Eddings quickly responded to this email, stating that she was "fighting the system" and that she "took an enormous risk marrying a local national at the last minute flying from one foreign country to another representing the US government. You are now paying the price." Pl.'s Opp'n, Ex. 5 (Nov. 25, 2008 email from Eddings to Linton). Eddings copied the school's Assistant Principal, Lucille Sutherland, to this email, despite the fact that she similarly lacked control over Linton's orders.

Shortly after this email exchange, on December 8, 2008, Sutherland observed Linton's classroom at Eddings' request for "a second opinion." Sutherland Dep. 38:18–19. Her "Record of Observation" noted discipline problems in Linton's classroom. During this same time period,

however, student misbehavior was a consistent problem throughout the school. Indeed, only a week later, on December 16, 2008, Eddings sent an email to the school's staff entitled "Student Behavior Concerns," in which he stated that students' parents had conveyed the following concerns: "1. Students carry a general tone of disrespect of authority of teachers in the classroom and we are too tolerant. 2. Students are sent to the office for misbehavior but nothing is done." Pl.'s Opp'n, Ex. 8. Teachers also complained about students being disrespectful to them. Eddings Dep. 56:3-7.

On February 12, 2009, Eddings observed Linton teach a geometry class. During what she believed would be a feedback meeting following this class, Eddings referred to her husband as a "third-world national" and referred to her as the "Ethiopian teacher." Linton Dep. 41:9-10. Later that afternoon, Eddings emailed Linton as follows:

> I am writing to you in reference to communication I have received *regarding our discussion about your husband's presence on the base and your lack of orders for him.* I have no intention and do not want to enter the process under which you have file a grievance .... My focus has been and will be on your performance in the classroom.

Pl.'s Opp'n, Ex. 14 (Feb. 17, 2009 email from Eddings to Linton) (emphasis added).

On February 24, 2009, Linton sought Equal Employment Opportunity ("EEO") counseling based on Eddings' acts and comments, which she perceived to be discriminatory. During this same timeframe, Eddings was apparently told by an official at DoDEA headquarters that he could terminate Linton. Eddings admitted that he did not want to participate in mediation of the EEO complaint, but was forced to by his supervisors. He thought the complaint was baseless and that it offended him. Significantly, Eddings had been accused of being a "militant African-American racist" while at another school previously. Eddings Dep. 95:18-96:17. So upset was he of this criticism that he filed his own EEO complaint alleging race discrimination

3

and reprisal, which was ultimately decided against him. Pl.'s Opp'n, Ex. 18 (Final Agency Decision).

Following Linton's submission of her EEO complaint, Eddings completed four written evaluations based on observations of her classroom performance. The two evaluations that he gave to Linton prior to terminating her were generally positive. The other two, which Linton did not receive until her discharge, were loaded with criticism. On April 24, 2009, only a month after Linton agreed to settle her EEO complaint,[3] Eddings handed Linton a Notice of Termination as well as the two previously undisclosed negative evaluations.

Because it is costly to replace an employee, the typical DoDEA protocol is to salvage struggling probationary employees by placing them on an improvement plan that identifies areas of improvement as well as a timeframe within which to work on those areas. Scharch Dep. 13:30–15:22. Eddings did not follow this process before terminating Linton, nor did he conduct the conferences he promised her or review her lesson plans before classes. Notably, only a few months after her termination, Defendant again hired Linton as a teacher at the Defense Language Institute in San Antonio, Texas.

Linton has exhausted her administrative remedies in this matter, having previously filed a charge with the DoDEA as well as the EEOC and the Office of Federal Operations ("OFO"). On August 14, 2014, the OFO dismissed her complaint. Subsequently, on November 14, 2014, she filed a four count Complaint in this Court. In Counts I, II, and IV, she alleged that she was terminated on the basis of her race, gender, and association with her foreign national husband, respectively. In Count III, she alleged that she was terminated in retaliation for filing an EEO complaint. On March 4, 2015, Defendant filed a motion for summary judgment, which the Court

---

[3] On March 20, 2009, Linton signed an "Informal Resolution" settling her EEO complaint. Pl.'s Opp'n, Ex. 15. Eddings signed the same document a month later on April 20, 2009, four days before terminating her.

4

denied as premature. Dkt. Nos. 13, 19. The parties have since engaged in discovery and Defendant now renews his motion for summary judgment. Dkt. No. 30.

## II. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

## III. Discussion

Defendant has moved for summary judgment on all four counts of the complaint. The resolution of the motion as to the retaliation claim turns on whether a reasonable juror could find for Linton on the issue of pretext. With respect to her discrimination claims, the motion turns on: (1) whether Linton was meeting Defendant's legitimate performance expectations; and (2) whether Defendant's non-retaliatory reason for terminating her was pretextual—in other words, whether the real reason was discriminatory animus based on her sex, race, and/or the national origin of her husband. The Court will address each of these issues in turn.

## A. *Retaliation Claim*

Under the section of Title VII of the Civil Rights Act of 1964 applicable to federal employees, "[a]ll personnel actions affecting employees or applicants for employment ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. §2000e-16. Although the Fourth Circuit has "never squarely held that § 2000e–16(a) prohibits retaliation in the federal workplace," it has decided several cases involving federal employees utilizing the standard governing such claims by private sector employees. *See, e.g.*, *Caldwell v. Johnson*, 289 F. App'x 579, 588 (4th Cir. 2008) (citing *Baqir v. Principi*, 434 F.3d 733, 742 n.16 (4th Cir. 2006)).

Because Linton does not appear to contend that any direct evidence exists to support her retaliation claim, the Court will apply the familiar *McDonnell Douglas* burden-shifting framework. Under this method, she must make a prima facie showing that: (1) she engaged in protected activity; (2) Defendant "took materially adverse action against her, such that it could dissuade a reasonable worker from making or supporting a charge of discrimination"; and (3) a causal connection existed between the protected activity and the materially adverse action. *Caldwell*, 289 F. App'x at 592 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)); *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003). Because Linton's "prior EEO complaint was settled only a few weeks before she was issued the Notice of Termination," Defendant does not dispute that she has established a prima facie case "solely on the issue of reprisal." Def.'s Reply Br. 2 n.1.

Accordingly, the burden now "shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse action." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). If the employer does so, "the burden shifts back to the plaintiff to

6

rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).

Defendant asserts that Linton must put forth evidence that "her engagement in protected activities was a 'but for' cause of her termination." Def.'s Opp'n 12 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202 (4th Cir. 2014)). The Fourth Circuit recently concluded, however, that the *McDonnell Douglas* framework "already incorporates a but-for causation analysis" and therefore *Nassar* had no effect on a plaintiff's burden to survive summary judgment under that framework. *Foster*, 787 F.3d at 249. Moreover, the court in *Foster* explicitly rejected the rationale of the Fourth Circuit decision cited by Defendant:

> In a recent published opinion, a panel of this Court stated the causation prong of the prima facie case as: "(3) that the protected activity was a 'but-for' cause of [Plaintiff's] termination and not simply a 'motivating factor.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 210 (4th Cir. 2014) (citing *Hill*, 354 F.3d at 285). The *Walker* court assumed that the plaintiff had established a prima facie case, and therefore did not apply its proposed test. The court also gave no indication that its proposed change to the prima facie case resulted from a construction of *Nassar*. Language in a published opinion that is "unrelated to the ratio decidendi of [the] case" is properly regarded as dictum rather than binding precedent. *United States v. Shepperson*, 739 F.3d 176, 180 n. 2 (4th Cir. 2014). For the reasons that follow, we are unpersuaded that the *Walker* dictum reflects the best reading of *Nassar* and decline to adopt its restatement of the prima facie case.

*Foster*, 787 F.3d at 251 n.11. *Foster* is thus more persuasive than *Walker* on this issue. Accordingly, because the Fourth Circuit has explicitly held that the *Nassar* but-for causation standard "does not demand anything beyond what is already required by the *McDonnell Douglas*

7

'real reason' standard," the Court will continue to apply the long-established precedent of this circuit on the issue of pretext. *Id.* at 252.

The Fourth Circuit has, on multiple occasions, observed that a plaintiff may create a factual issue as to pretext by showing that "the defendant's explanation for an employment decision is 'unworthy of credence' or that the defendant's explanation is false." *E.g., Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). An "employer's conscious, unexplained departure from its usual policies and procedures" may support an inference of discrimination, but additional evidence is required. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 396 (5th Cir. 2002); *accord, e.g., DAG Petroleum Suppliers, LLC v. BP PLC*, 268 F. App'x 236, 242 (4th Cir. 2008) (per curiam) (holding that "evidence that an employer erroneously or even purposely misapplied its own policy ... will not suffice to overcome summary judgment" on issue of pretext (quotations and brackets omitted)); *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir.1998) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." (citation and internal quotation marks omitted)), *overruled on other grounds by Reeves*, 530 U.S. 133. Likewise, temporal proximity between the protected activity and the adverse action is insufficient, by itself, to establish pretext. *Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

Here, Defendant has proffered a legitimate, non-retaliatory reason for Linton's termination—her failure to demonstrate "mastery and control as the education leader in the classroom" and to "effectively manage classroom behavior." Def.'s Mot. Summ. J. ("SJ Mot."), Ex. 14 (Linton's Notice of Termination). In response, Linton points to the following evidence to

show that Eddings' opinion about her performance was "unworthy of credence": (1) the close temporal proximity between the settlement of her EEO complaint and her termination; (2) Eddings' statement that he was "mediating against [his] will" because he thought Linton's complaint "was baseless" as well as "absolutely and completely offensive. I'm offended to this day," Eddings Dep. 73:3–14, 96:17–97:10; (3) Eddings' admission to being offended by prior accusations, while employed at another school, of being "a militant African American racist," Eddings Dep. 95:18–96:16; (4) Eddings' failure to follow DoDDS protocol for addressing a teacher's poor performance by not placing her on an improvement plan or providing her with direction on how to improve before terminating her, *compare* Scharch Dep. 13:20–16:19, *with* Eddings Dep. 119:3–14; (5) the fact that she was "singled out" for discipline, even though students' parents complained about other teachers—who did not engage in protected activity—and Eddings believed that these other teachers "really don't care about their jobs, and doing their jobs well. They ... don't really take their job seriously," Eddings Dep. 59:15–17; 61:18–21; (6) the fact that student misbehavior was a problem throughout the school, not just in her classroom, as evidenced by Eddings' email entitled "Student Behavior Concerns," Pl.'s Opp'n, Ex. 8; *see also* Christensen Dep. 22:3–14; Eddings Dep. 56:3–7; and (7) Eddings' admission that the decision[3] to terminate Linton transpired in February 2009, at or around the time of Linton's EEO complaint and, significantly, *before* he completed four written evaluations of her performance in the classroom. Eddings Dep. 123:15–124:14.

---

[3] Whether this decision was Eddings' alone or at the direction of an official at DoD headquarters is a disputed issue of fact. In response to the question of whether DoDDS's Mediterranean Chief of Staff Barbara Ferg-Carter had a role in Linton's termination, Eddings testified: "She absolutely said, you're going to terminate her. In fact, once I announced that I was probably going to be returning to the states, she said, make sure you complete this process. Don't you dare leave this teacher for another principal." Eddings Dep. 123:19–124:3. The natural inference from his recollection of the conversation, if it indeed happened, is that Eddings told her he wanted to fire Linton and she responded as above.

Defendant counters that none of these assertions are evidence "that the legitimate reasons offered by Defendant were not its true reasons," because the allegations do not "contradict Defendant's clearly stated reasons for the termination." Def.'s Reply Br. 9; *see also King*, 328 F.3d at 151 (finding that none of the plaintiff's allegations established pretext in Title VII retaliation claim because they did not "*contradict* appellee's proffered discharge motive" (emphasis in original)). Turning to the first proffered evidence of pretext, although a reasonable jury could infer pretext from the close temporal proximity between Linton's EEO complaint and her discharge, this evidence may not be the sole basis for such a finding. Linton has, however, offered other evidence to bolster a finding of pretext. Eddings' statements about mediating against his will, finding her complaint "absolutely offensive" as well as his admitted sensitivity to accusations of racism in the past could very well support a jury finding that his discharge of Linton was in retaliation for submitting an EEO complaint against him. Perhaps the strongest evidence of pretext is Eddings' admission that the decision to terminate Linton occurred in *February* 2009. This is, of course, the month when she filed the EEO complaint and, importantly, *before* he purportedly papered the record with mostly negative evaluations of her. This evidence thus serves to contradict Defendant's claim to have terminated Linton because of her poor performance because it potentially shows that Eddings' evaluations were neither objective nor genuine.

As to her claims that she was "singled out" for discipline, however, Linton has failed to show that she and other teachers who were not fired for failing to manage their classrooms, and who did not engage in protected activity, were similarly situated in all relevant aspects—namely, a shared status as a probationary employee. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that

10

similarly situated employees were not treated equally."); *see also Pauling v. Gates*, No. 1:10-cv-1196, 2011 WL 1790137, at *9 (E.D. Va. May 6, 2011) (citing *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (holding that "probationary employee and permanent employees are not similarly-situated . . . [and] under federal regulations, probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee")). At oral argument, counsel confirmed that he was unaware of any other probationary employees who had been fired by Eddings during Linton's tenure at the school. Accordingly, her claim that she was "singled out" cannot support a finding of pretext.

As to the evidence of Eddings' failure to follow DoDDS protocol, there is a disputed issue of fact as to whether Defendant had a policy of remediating probationary teachers. Defendant points to its Administrators' Manual, which states that, during an employee's probationary period, "the employee's conduct and performance should be closely observed, and the employee may be terminated at anytime [sic] during the trial or probationary period if the circumstances warrant." Def.'s SJ Mot., Ex. 19. However, Defendant's own designated Rule 30(b)(6) witness testified that because it is "costly for us to replace an employee," probationary employees are "usually" placed on an Improvement Plan that identifies areas of improvement as well as a timeframe within which to work on those areas. Scharch Dep. 13:30–15:22; *accord Soutter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 132 (E.D. Va. 2014) ("Rule 30(b)(6) is a rule that applies to depositions in which an opposing party is given the opportunity to question a corporate entity and bind it for purposes of the litigation." (citation, internal quotation marks, and emphasis omitted)). Because there is a disputed issue of fact as to whether Eddings departed from DoDDS protocol, this evidence, in conjunction with the other evidence of pretext, may support an inference of discrimination. *Tyler*, 304 F.3d at 396; *Vaughan*, 145 F.3d at 203.

Viewing the facts in the light most favorable to Linton, the Court concludes that there is sufficient evidence of pretext for a reasonable jury to find that Eddings' termination of Linton was in retaliation for her EEO complaint against him in February 2009. Summary judgment will therefore be denied as to the retaliation claim.

### B. *Discrimination Under Title VII*

To prevail on her discrimination claims, Linton must either point to direct or indirect evidence of discrimination, or proceed under the *McDonnell Douglas* burden-shifting framework. *E.g., Foster*, 787 F.3d at 249. Because she has proffered evidence under both methods, the Court will discuss the validity of each in turn.

#### i. Direct Evidence

Linton contends that Eddings' various racially tinged comments constitute direct evidence of discrimination. Direct evidence encompasses "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citation and internal quotation marks omitted). Specifically, Linton cites an email in which Eddings expressed concern over a picture of naked children that she intended to use in a lesson on poverty. Linton Dep. 40:23–24. In the email, dated October 19, 2008, Eddings stated that "if these were white kids it would be considered pornography," and that he was "confident poverty could be displayed without exposed genitals being involved." Def.'s SJ Mot., Ex. 16. This incident, however, was not cited by Eddings in his evaluations or in Linton's Notice of Termination. As a result, the comments do not "bear directly on the contested employment decision," and are therefore not direct evidence of discrimination. *Warch*, 435 F.3d at 520. *Warch* dictates the same conclusion as to another of Eddings' emails to Linton, dated November

12

25, 2008, in which he admonished her for "t[aking] an enormous risk marrying a local national at the last minute flying from one foreign country to another representing the US government. You are now paying a price." Pl.'s Opp'n, Ex. 5. Similarly, Eddings' references to her as "the Ethiopian teacher" and to her husband as a "local national," "third world national," and/or "third country national" do not bear at all on her termination. *Id.*; Linton Dep. 40:16–41:10. Accordingly, none of the above comments constitute direct evidence of discrimination, and Linton must proceed under the *McDonnell Douglas* burden-shifting method.

### ii. McDonnell Douglas *burden-shifting method*

Under the *McDonnell Douglas* framework, a plaintiff sets forth a prima facie case of intentional discrimination by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Hill*, 354 F.3d at 285, *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Once the plaintiff has met her initial burden, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, the burden shifts back to the plaintiff to demonstrate that the "employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

Defendant concedes that Linton has met the first two prongs of her discrimination claims.[4] Def.'s Mem. Supp. SJ Mot. 12. He asserts, however, that Linton has not proffered any

---

[4] By omitting argument on the issue, Defendant also appears to concede that Linton has satisfied the fourth prong of her prima facie case—whether the position remained open or was filled by similarly qualified applicants outside the protected class. *See* Def.'s Mem. Supp. SJ Mot. 12–14. Even if the matter was not conceded, Linton need not make a showing on this element because Eddings did not hire her replacement. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th

13

evidence to support the third prong—that she met her employer's legitimate expectations at the time she was fired.[5] Importantly, a plaintiff's own self-serving testimony cannot create a disputed issue of material fact on this issue because "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (citation and internal quotation marks omitted). This Court has consequently held that a plaintiff fails to set forth a prima facie case where there are "*legitimate* performance-based incidents and violations identified and relied on by the [employer] to justify plaintiff's termination." *Luther v. Gutierrez*, 618 F. Supp. 2d 483, 493 (E.D. Va. 2009) (emphasis added). However, if a plaintiff presents evidence that her supervisor has "papered the record" with negative evaluations to conceal his discriminatory animus, such evaluations cannot fairly be characterized as "legitimate," and thus cannot be used to justify her termination. *See Gries v. Zimmer, Inc.*, 940 F.2d 652 (4th Cir. 1991) (holding judgment notwithstanding the verdict was improper because "[i]f the jury had disbelieved [the supervisor's] testimony that he had 'lost confidence' in the three men and therefore had decided to terminate them, it could have chosen to conclude, based on the evidence, that he had created a paper record to suggest that their termination had not been based on age discrimination").

In support of summary judgment, Defendant points to Eddings' "sworn testimony that Plaintiff's classroom was chaotic," as well as "'feedback sheets' provided to the Plaintiff at the time her performance was observed." Def.'s Mem. Supp. SJ Mot. 13 (citing Def.'s Exs. 4, 6, 7–12). Of course, as discussed above, Eddings' negative evaluations came on the heels of Linton's EEO complaint against him as well as near or after the decision to terminate her. A reasonable

---

Cir. 2005) (holding that when the "firing and replacement hiring decisions were made by different decision makers, the plaintiff can make out a *prima facie* case without showing replacement by someone outside the protected class").
[5] Notably, Linton did not seek, as intimated by the Court in its prior opinion denying summary judgment as premature, expert opinion testimony as to the essential elements of "[Defendant's] legitimate job performance expectations and ... [Plaintiff's] performance in light of those expectations." *King*, 328 F.3d at 149–50.

jury could thus find that his critiques were not genuine. Likewise, Sutherland's single classroom observation and evaluation on December 8, 2008 occurred shortly after Plaintiff had filed a grievance, of which Sutherland was aware, regarding adding her husband to her travel orders. Sutherland Dep. 37:11–38:19; Pl.'s Opp'n, Ex. 5 (Nov. 25, 2008 email from Linton to various officials at the school's headquarters in Belgium). Moreover, there is evidence that the disciplinary issues noted in Sutherland's evaluation were representative of the school as a whole, not just Linton's classroom. Pl.'s Opp'n, Ex. 8 (Eddings email to staff, dated December 16, 2008, entitled "Student Behavior Concerns").

With respect to Christensen's email to Eddings and Sutherland, in which he reported that students had complained that Linton "rarely teaches a group lesson, but rather has students working on separate sections of material as she provides individual assistance," Eddings himself testified that DoDEA did not have a particular preference for a style of teaching so long as it was effective, and that Linton's "guide on the side" style is "almost a plus" when he observes it in a classroom. Eddings Dep. 110:3–112:22; Def.'s SJ Mot., Ex. 4.

Of course, it is Linton's burden to proffer evidence that she was meeting Defendant's legitimate job performance expectations. Although Eddings himself testified that Linton's certifications were "out of this world," and that "she was a dream for any small school principal," this observation was based on viewing her resume prior to her arrival at the school, not on her actual performance. Eddings Dep. 120:14–22. However, her two "generally positive" evaluations, which are the only ones she claims were shared with her following her EEO complaint, are sufficient to satisfy her burden to show that she was meeting Defendant's legitimate performance expectations. Accordingly, Linton has set out a prima facie case of discrimination under Title VII.

15

As discussed above with respect to the retaliation claim, Linton has also put forth sufficient evidence to show that Defendant's proffered reasons for terminating her were "unworthy of credence." *Burdine*, 450 U.S. at 256. Furthermore, a reasonable jury could find, based on Eddings' various comments about race and national origin as well as Laurie Garner's testimony that Eddings harassed female teachers and "never bothered any men," that Defendant's proffered reasons were a pretext for discrimination based upon Linton's race, gender, and the national origin of her husband. Garner Dep. 41:1–44:22; *Foster*, 787 F.3d at 250. Accordingly, Linton has met her burden under the *McDonnell Douglas* framework and her discrimination claims will be allowed to proceed to trial.

## IV. Conclusion

For the foregoing reasons, Defendant Ashton Carter's motion for summary judgment will be denied.

An appropriate Order shall issue.

August 18, 2015

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge